IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 16-cv-02181-NRN

BARBARA FREEMAN,

Plaintiff,

v.

COLORADO DEPARTMENT OF CORRECTIONS,
DENVER WOMEN'S CORRECTIONAL FACILITY, a Colorado Department of Corrections facility,
RICK RAEMISCH, in his official capacity as the Executive Director of the Colorado Department of Corrections,
MAJ. GILBERT CALEY, in his official capacity as a General at the Denver Women's Correctional Facility,
LT. BRENDA BLAND, in her official capacity as a Lieutenant at the Denver Women's Correctional Facility,
SGT. TRISHA JESIK, in her official capacity as a Sergeant at the Denver Women's Correctional Facility,
SGT. CRYSTAL SESMA, in her official capacity as a Sergeant at the Denver Women's Correctional Facility,
LT. JILL GLACIER, in her official capacity as a Lieutenant at the Denver Women's Correctional Facility,
C/O BRITTANY HOUTZ, in her official capacity as an Officer of the Denver Women's Correctional Facility,

Defendants.

---

## OPINION AND ORDER

---

**N. REID NEUREITER**
**United States Magistrate Judge**

      This case is before the Court pursuant the parties' consent to magistrate judge jurisdiction. (Dkt. #69.) On September 28, 2018, Defendants Lieutenant Brenda Bland, Captain Gilbert Caley, the Colorado Department of Corrections ("CDOC"), the Denver Women's Correctional Facility ("DWCF"), Lieutenant Jill Glacier, Sergeant Trisha Jesik, Correctional Officer Brittany Houtz, Rick Raemisch, and Sergeant Crystal Sesma

(collectively "Defendants") filed a Motion for Summary Judgment. (Dkt. #94.) Plaintiff Barbara Freeman filed a response on November 12, 2018 (Dkt. #98), and the Court heard argument on December 18, 2018. (Dkt. #99.) The Court has reviewed the parties' filings, taken judicial notice of the Court's entire file in this case, and considered the applicable Federal Rules of Civil Procedure, statutes, and case law. Now being fully informed, the Court makes the following order.

## I. BACKGROUND

**a. Procedural History**

Magistrate Judge Michael Watanabe recited the procedural background of this case in his June 22, 2018 Order (Dkt. #87), which dismissed Mrs. Freeman's 42 U.S.C. § 1983 claim, but allowed her claim for compensatory and punitive damages under Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131–34 (the "ADA") to go forward.[1] Upon Magistrate Judge Watanabe's retirement, this case was reassigned to me. (Dkt. #90.)

In the relevant portions of her Third Amended Complaint (Dkt. #75), Mrs. Freeman claims that Defendants failed to make reasonable accommodations for her disabilities while being housed at the DWCF. Specifically, she alleges that, for a period of approximately 30 days in 2016, Defendants failed to place her in a handicapped-accessible cell equipped with necessary accommodations for disabled inmates (known as a "Montez Remedial room"), including services provided by an inmate aide (known as an Offender Care Aid ("OCA")) to help perform various tasks, a thicker mattress

---

[1] Mrs. Freeman clarified in her response that she does not request punitive damages. (Dkt. #90 at 15-16.) Accordingly, the Court will not address Defendants' arguments as to this issue.

2

(known as a "medical mattress"), and hearing and visual aids in the event of an emergency evacuation. (*Id.* ¶¶ 25-27, & 29.) As a result, during those 30 days, Mrs. Freeman (1) bathed only once, due to her fear of falling while showering unassisted; (2) missed several meals because she could not walk alone to the cafeteria without falling; and (3) could not take her medication because she could not walk unassisted to medication dispensary line (the "med-line"). (*Id.* ¶¶ 38-40.) Plaintiff informed Defendants Caley, Bland, Jesik, Sesma, and Glacier that the non-Montez Remedial room was inadequate to accommodate her needs, but these Defendants did nothing to assist her. (*Id.* ¶ 41.)

Defendants now move for summary judgment on Mrs. Freeman's ADA claim. They argue that Mrs. Freeman has made no showing that she suffered any compensable damages or that Defendants intentionally discriminated against her.

**b. Factual Background**

Mrs. Freeman is a woman in her eighties and is housed in the DWCF. Mrs. Freeman has mobility impairments, hearing impairments, complete blindness in her right eye and a visual impairment in her left eye, an inability to stand for longer than two minutes unassisted, an inability to bend over, severe arthritis in her hands, and asthma. (Dkt. #98-1 ¶ 3.) Because of her impairments, Mrs. Freeman is entitled to certain accommodations pursuant to the ADA. The CDOC's Office of the ADA Inmate Coordinator ("AIC"), which consists of 2 employees and has AIC coordinators at every facility, is tasked with evaluating and providing offenders with these accommodations.

Mrs. Freeman requested, and the Office of the AIC provided, the following ADA accommodations: access to the talking-book library; access to a DWCF elevator

(although Mrs. Freeman claims that it is often out of order, pointing to a recent incident in September 2018); additional time to complete activities of daily living; an extra blanket; authorization to purchase a vibrating watch without sufficient funds; and assistance with carrying and disposing of meal trays.

The Office of the AIC also provided the following accommodations, even though Mrs. Freeman did not request them: closed captioning that remains on in the day hall; additional time for movement within the facility; access to a shower chair; accommodations when being retrained, searched, and transported; authorization to wear medical footwear in all areas of DWCF and during transportation; and a wheelchair pusher.

Mrs. Freeman currently has the following assistive devices and medical equipment: medical boots/shoes, issued on June 14, 2016; two hearing aids, issued on September 3, 2014; and medically necessary shoes/shoe inserts, issued on October 23, 2014. Mrs. Freeman also has a wheelchair, but while Defendants claim that it was issued in October 2016, Mrs. Freeman contends it was only provided in February 2018, three years after she requested it.

Mrs. Freeman states that, contrary to Defendants' assertions, DWCF denied and/or ignored her requests for personal notice of irregular overhead announcements, for access to staff assistance during evacuations, and for a backpack. (Dkt. #98-1 ¶¶ 22, 24, & 28.) She also requested and was denied a place to sit while she was in the med-line, a toothbrush that accommodates her severe arthritis, and assistance reading the law library computer.

In July 2016, Defendants moved Mrs. Freeman from Unit 1, an "incentive unit," to Unit 3. Defendants state that Mrs. Freeman was regressed because she harassed and bullied a series of cellmates by instituting various rules and regulations about what could and could not go on in the cell, so DWCF staff determined that placement in a single cell was the best option. (Dkt. #94-2 at 4-6; #94-3 at 3-4; #94-4; #94-5 at 4-10; #94-6 at 11-14.) Mrs. Freeman denies that she bullied anyone, but rather only "made accommodation requests to her cellmates because of her disabilities." (Dkt. #98-1 ¶ 12-13.)

In any event, Mrs. Freeman claims that her Unit 3 cell did not meet her needs. She states that she lost her "medical mattress" accommodation, access to the ADA accessible bathroom[2], personal notice announcements, and access to an ADA compliant trunk or closet. (*Id.* ¶ 32.) She remained in Unit 3 for approximately 30 days.

The primary focus of Mrs. Freeman's ADA claim centers around her access to an OCA III and a "medical mattress." OCAs assist other inmates with various types of physical and/or mental limitations. There are three OCA levels. An OCA I essentially pushes wheelchairs. (Dkt. #98-6.) An OCA II assists "offenders with minimal physical and/or mental limitations in the performance of activities of daily living" by helping with hygiene, dining, cleaning and laundry, etc. (Dkt. #98-7.) An OCA III assists offenders with "significant limitations and/or extensive medical needs" by transferring him/her to and from the toilet, shower, and bed; turning and repositioning the offender; and assisting with "toileting and bathing." (Dkt. #98-5.)

---

[2] While Mrs. Freeman concedes that she technically had access to the ADA bathroom, she claims that non-disabled inmates often use the facilities, which limited her ability to use them.

Mrs. Freeman contends that she required an OCA III to accompany her while walking in DWCF to prevent her from falling and injuring herself, and that without one, she cannot go to meals, the med-line, or shower. (Dkt. #98-1 ¶¶ 8 & 10.) She states that she was assigned an OCA III in 2015 by Dr. Rishi Ariola-Tirella. (Dkt. #98-8.) On September 14, 2016, Deb Reilly, PA-C wrote in an email that she had talked with prison staff that day and "it was decided Mrs. Barbara Freeman will also be allowed to have a OCA 3, since that is what is required to help her walk from place to place." (Dkt. 98-9.) In June 2017, Dr. Ariola-Tirella stated in an email that he "thought we had approved [Mrs. Freeman] an OCA 3 to hold on to her when she is walking and has episodes of vertigo." (Dkt. #98-10.) When she was denied an OCA II or III while living in Unit 3, Mrs. Freeman claims that she missed seven meals and missed her "medications many times." (Dkt. #98-1 ¶ 9.)

Defendants argue that Mrs. Freeman was given the appropriate OCA accommodations. In October 2016, Ms. Reilly asked Dr. Susan Tiona, the CDOC's Chief Medical Officer, to "put in for an OCA III." (Dkt. #94-8 at 2.) Dr. Tiona responded that Mrs. Freeman needed a wheelchair, not an OCA III, because even with an OCA III, she was liable to fall while walking longer distances. (*Id.* at 1.) Defendants point out that Mrs. Freeman had an OCA when she was in Unit 3, but she was often dissatisfied with their work. Defendants claim that Mrs. Freeman's complaints about her OCAs were often racially motivated, which Mrs. Freeman denies. Defendants argue there is no pattern of missed meals or trips to the med-line, and note that Mrs. Freeman maintained a steady weight throughout this period. (Dkt. #94-10.)

Mrs. Freeman also alleges that Defendants denied her a "medical mattress." It appears that in October 2013, DWCF's medical staff ordered Mrs. Freeman a "medical mattress and an extra pillow to help her breathing." (Dkt. #98-11.) However, Defendants claim that there is no accommodation for a medical mattress; instead, offenders housed in an incentive unit, like Unit 1, get different mattresses from general population units. (Dkt. #94-6 at 7-8.)

## II. LEGAL STANDARD

A motion for summary judgment serves the purpose of testing whether a trial is required. *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1185 (10th Cir. 2003). A court shall grant summary judgment if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is material if it might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The moving party bears the initial responsibility of providing to the court the factual basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "The moving party may carry its initial burden either by producing affirmative evidence negating an essential element of the nonmoving party's claim, or by showing that the nonmoving party does not have enough evidence to carry its burden of persuasion at trial." *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002). Only admissible evidence may be considered when ruling on a motion for summary judgment. *World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d 1467, 1474 (10th Cir. 1985).

If the movant properly supports a motion for summary judgment, the non-moving party has the burden of showing there are issues of material fact to be determined. *Celotex*, 477 U.S. at 322. That is, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing a genuine factual issue for trial. Fed. R. Civ. P. 56(e); *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."). S*ee also Hysten v. Burlington N. & Santa Fe Ry.*, 296 F.3d 1177, 1180 (10th Cir. 2002). These specific facts may be shown "'by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves.'" *Pietrowski v. Town of Dibble*, 134 F.3d 1006, 1008 (10th Cir. 1998) (quoting *Celotex*, 477 U.S. at 324). "[T]he content of summary judgment evidence must be generally admissible and . . . if that evidence is presented in the form of an affidavit, the Rules of Civil Procedure specifically require a certain type of admissibility, i.e., the evidence must be based on personal knowledge." *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1122 (10th Cir. 2005). "The court views the record and draws all inferences in the light most favorable to the non-moving party." *Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. Pepsico, Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005).

### III. ANALYSIS

Defendants argue that the Court should enter summary judgement on Mrs. Freeman's ADA claim because Mrs. Freeman has made no showing that Defendants intentionally violated Title II, and therefore they are entitled to immunity under the Eleventh Amendment.

In his June 22, 2018 Order, Judge Watanabe explained Eleventh Amendment immunity in the context of an ADA suit:

> The doctrine of Eleventh Amendment immunity protects states and their agents from suit when acting in their official capacities. *Fent v. Okla. Water Res. Bd.*, 235 F.3d 553, 558–559 (10th Cir. 2000). To the extent that Plaintiff sues Defendants in their official capacities, "[s]uits against state officials in their official capacit[ies] should be treated as suits against the state." *Hafer v. Melo*, 502 U.S. 21, 25 (1991) (citing *Kentucky v. Graham*, 473 U.S. 159, 166 (1985)). Thus, pursuant to the Eleventh Amendment, the Court lacks subject matter jurisdiction to adjudicate an action brought by a citizen of a state against the state itself, its agencies, or its officials in their official capacities for monetary relief. *See Johns v. Stewart*, 57 F.3d 1544, 1552 (10th Cir.1995).
>
> However, the Supreme Court has held that "Congress may abrogate the State's Eleventh Amendment immunity." *Tennessee v. Lane*, 541 U.S. 509, 517 (2004). When analyzing whether Congress has effectively abrogated sovereign immunity, the Court "must resolve two predicate questions: first, whether Congress unequivocally expressed its intent to abrogate that immunity; and second, if it did, whether Congress acted pursuant to a valid grant of constitutional authority." *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 73 (2000). Congress unequivocally expressed its intent to abrogate Eleventh Amendment immunity for ADA claims by enacting the following language: "A State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in Federal or State court of competent jurisdiction for a violation of this chapter." 42 U.S.C. § 12202; *see also Lane*, 541 U.S. at 518. To resolve "whether Congress acted pursuant to a valid grant of constitutional authority" when it expressed this intent, the Court applies the three-step analysis set forth in *United States v. Georgia*, 546 U.S. 151 (2006). The Court must determine,
>
>> on a claim-by-claim basis, (1) which aspects of the State's alleged conduct violated Title II; (2) to what extent such misconduct also violated the Fourteenth Amendment; and (3) insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid.
>
> 546 U.S. at 159.

(Dkt. #87 at 12-13.)

Mrs. Freeman argues that Judge Watanabe has already determined that the Eleventh Amendment does not bar her ADA claim, and without new legal theories, the law of the case doctrine forecloses this argument. However, Judge Watanabe performed his Eleventh Amendment immunity analysis through the lens of a Rule 12(b)(6) motion. Here, Defendants move for summary judgment, arguing that the undisputed facts demonstrate that Mrs. Freeman's disabilities were appropriately accommodated, and therefore there was no violation of Title II of the ADA. To resolve this issue under the Rule 56 standard, the Court must now discuss the *United States v. Georgia* elements in light of the evidence presented by the parties.

**a. Step One: The ADA**

Title II of the ADA states, in relevant part, that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. ADA regulations require public entities to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability." 28 C.F.R. § 35.130(b)(7). A public entity must provide a reasonable accommodation under the ADA when it knows that the individual is disabled and "requires an accommodation of some kind to participate in or receive the benefits of its services." *Robertson v. Las Animas Cty. Sheriff's Dep't*, 500 F.3d 1185, 1197 (10th Cir. 2007). "[A] public entity is on notice that an individual needs an accommodation when it knows that an individual requires one, either because that need is obvious or because the individual requests an accommodation." *Id.* at 1197–98.

To state a claim under Title II, a plaintiff must allege that "(1) [s]he is a qualified individual with a disability, (2) who was excluded from participation in or denied the benefits of a public entity's services, programs, or activities, and (3) such exclusion, denial of benefits, or discrimination was by reason of a disability." *Id.* at 1193. The Tenth Circuit requires a showing of intentional discrimination before a plaintiff may recover compensatory damages for mental or emotional injury. *Tyler v. City of Manhattan*, 118 F.3d 1400, 1403–4 (10th Cir. 1997); *Powers v. MJB Acquisition Corp.*, 184 F.3d 1147, 1152 (10th Cir. 1999).[3]

Given her limitations, it is undisputed that Mrs. Freeman is "disabled" as defined by the ADA. Defendants instead focus on whether there is any evidence of intentional discrimination. If such evidence does not exist, then she has suffered no compensable damages and her claim cannot go forward.

"Intentional discrimination does not require a showing of personal ill will or animosity toward the disabled person; rather, 'intentional discrimination can be inferred from a defendant's deliberate indifference to the strong likelihood that pursuit of its questioned policies will likely result in a violation of federally protected rights.'" *Barber ex rel. Barber v. Colo. Dep't of Revenue*, 562 F.3d 1222, 1229 (10th Cir. 2009) (quoting *Powers.*, 184 F.3d at 1153). "The test for deliberate indifference in the context of

---

[3] Although the *Powers* case, and others cited herein, involve the Rehabilitation Act, rather than the ADA, the Court applies the same standard because "[t]o the extent feasible, we look to decisions construing the Rehabilitation Act to assist us in interpreting analogous provisions of the ADA." *J.V. v. Albuquerque Pub. Sch.*, 813 F.3d 1289, 1298 n.6 (10th Cir. 2016) (quotations omitted). *See also Duvall v. Cty. of Kitsap*, 260 F.3d 1124, 1138 (9th Cir. 2001) ("To recover monetary damages under Title II of the ADA or the Rehabilitation Act,11 a plaintiff must prove intentional discrimination on the part of the defendant.").

11

intentional discrimination comprises two prongs: (1) 'knowledge that a harm to a federally protected right is substantially likely,' and (2) 'a failure to act upon that likelihood.'" *Id.* (quoting *Duvall*, 260 F.3d at 1139) (alteration omitted).

Here, while the Court agrees with Defendants that there is no evidence that Mrs. Freeman's transfer to Unit 3 was based on her disability, as opposed to her behavior, Defendants were still required to make reasonable accommodations for her disabilities. Mrs. Freeman argues that Defendants' intent to discriminate against her can be inferred from their deliberate failure to make these accommodations. In light of the numerous disputed material facts regarding which accommodations were necessary and which were provided, the Court determines that summary judgment is not appropriate.

First, the parties dispute what level of OCA Mrs. Freeman was entitled to. Although Defendants argue that Mrs. Freeman was never entitled to an OCA III, it appears that DWCF staff members themselves were confused about what accommodations were put in place. For example, in September 2015, Dr. Ariola-Tirella determined that an OCA III was appropriate for "activities of daily living." (Dkt. #98-8.) It was left unstated precisely what these activities included. Mrs. Freeman claims that the OCA III assisted her in "showering, using the restroom, handling my food tray, ensuring that I do not fall while walking, cleaning my cell, and accessing items that I cannot reach." (Dkt. #98-1 ¶ 5.) However, in June 2017, Dr. Ariola-Tirella opined that it would be inappropriate for Mrs. Freeman to have an OCA III "that lives with her 24/7," and instead "thought we had approved her an OCA 3 to hold on to her when she is walking and has episodes of vertigo." (Dkt. #98-10.) It remains a question of fact what events, if any, occurred in the intervening period that affected the OCA determination.

Similarly, in September 2016, Ms. Reilly spoke with DWCF staff and decided that Mrs. Freeman would be allowed to have an OCA III "because that is what is required to walk from place to place" (Dkt. #98-9), only to be overruled a month later by Dr. Tiona, who determined that Mrs. Freeman did not qualify for an OCA III. (Dkt. #94-8.) Dr. Tiona's opinion therefore conflicts with that of Ms. Reilly and Dr. Ariola-Tirella.

Defendants rightly point out that a difference of opinion among medical providers does not necessarily amount to deliberate indifference. Moreover, it appears that many of the duties performed by an OCA II, which Mrs. Freeman was often (although not always) provided, would be sufficient to meet the "activities of daily living" identified by Mrs. Freeman. However, the fact remains that Mrs. Freeman has presented evidence indicating that, at least at one point in time, Mrs. Freeman was deemed to require an OCA III rather than an OCA II.

Dr. Tiona's email is also important for a separate, though related, reason: it indicates that it was medically necessary for Mrs. Freeman to have a wheelchair. Although Defendants claim that Mrs. Freeman was issued a wheelchair in October 2016, [4] Mrs. Freeman contends that she requested one in 2015 but did not actually get a wheelchair until 2018. (Dkt. #98-1 ¶ 31.) Mrs. Freeman states that she cannot stand in place for more than a few minutes or walk unassisted, which affects her ability to get her medication and food. (*Id.* ¶ 9.) It appears that Dr. Tiona agreed, opining in 2016 that Mrs. Freeman "needs to be in a wheelchair for distances—simple as that." (Dkt. #94-8.)

---

[4] Adrienne Jacobson, the CDOC's AIC and Associate Director of Legal Services for the Colorado Department of Corrections, submitted an Affidavit indicating that a wheelchair was issued in October 2016. (Dkt. #94-1 ¶ 7.) She cites as an exhibit a list of Inmate Property, which apparently supports this assertion. However, no such list is attached as an exhibit to Ms. Jacobson's Affidavit or the summary judgment motion.

13

Given Mrs. Freeman's allegation that a wheelchair was not provided for at least 14 months after Dr. Tiona's email, issues of material facts exist as to whether Defendants' failure to provide this reasonable accommodation was intentional.

The alleged failure to provide a wheelchair is also relevant because the primary duty of an OCA I is to push wheelchairs. It is undisputed that on certain occasions, Mrs. Freeman was only assigned an OCA I. On these days, it is possible that Mrs. Freeman's ability to get her meals and medication would be affected because an OCA I would not be able to assist her with walking, waiting in lines, and retrieving food trays.

There is also a factual dispute as to whether Mrs. Freeman received personal notice of announcements, which she requires due to her hearing impairments. (Dkt. #98-1 ¶ 22.) As to the "medical mattress," Defendants claim that it is not actually referred to as a medical mattress, but is instead just a mattress given to offenders in the incentive unit as a kind of reward. (Dkt. #94-6 at 7.) Defendants' position is undermined by Dr. Joan Martin's October 2013 note asking DWCF nurses to "please get medical mattress and extra pillow for breathing." (Dkt. #98-11.) This suggests (1) that CDOC medical personnel may, under some circumstances, consider mattresses to have a medical component; and (2) that Mrs. Freeman was entitled to this accommodation, at least in 2013. Whether circumstances changed in 2016 such that Mrs. Freeman no longer required such a mattress is not currently before the Court and is better addressed at trial.

In short, it is undisputed that Mrs. Freeman had limitations such that she was and is considered disabled pursuant to the ADA. It is also undisputed that Defendants were aware of her disabilities. Further, there are disputed material facts as to whether

14

Defendants failed to provide Mrs. Freeman with reasonable accommodations in the form of an appropriate OCA, a wheelchair, personal notice of announcements, and a medical mattress. A reasonable juror could infer that, given Defendants' knowledge of Mrs. Freeman's limitations, coupled with their alleged failure to provide necessary accommodations, Defendants acted with a deliberate indifference to a strong likelihood that pursuit of its policies would likely result in a violation Mrs. Freeman's rights under the ADA. Accordingly, summary judgment is not appropriate. *See Georgia*, 546 U.S. at 157 ("[I]t is quite plausible that the alleged deliberate refusal of prison officials to accommodate Goodman's disability-related needs in such fundamentals as mobility, hygiene, medical care, and virtually all other prison programs constituted 'exclu[sion] from participation in or . . . deni[al of] the benefits of' the prison's 'services, programs, or activities.'") (quoting 42 U.S.C. § 12132).

**b. Step Two: The Fourteenth Amendment**

As Judge Watanabe explained:

The Due Process Clause of the Fourteenth Amendment incorporates the Eighth Amendment's guarantee against cruel and unusual punishment. *Georgia*, 546 U.S. at 157 (citation omitted). "The Eighth Amendment's prohibition of cruel and unusual punishment imposes a duty on prison officials to provide humane conditions of confinement, including adequate food, clothing, shelter, sanitation, medical care, and reasonable safety from bodily harm." *Tafoya v. Salazar*, 516 F.3d 912, 916 (10th Cir. 2008). "[A] prison official violates the Eighth Amendment only when two requirements are met. First, the deprivation alleged must be, objectively, sufficiently serious; a prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). Second, the prison official "must have a sufficiently culpable state of mind," which means that the official may not be "found liable under the Eighth Amendment . . . unless the official knows of and disregards an excessive risk to inmate health or safety." *Id.* at 834, 837 (quotation omitted). The requirement that a prison official "know[ ] of and disregard[ ] an excessive risk to inmate health or safety" logically dictates that a "deprivation of [necessities] without any corresponding

15

> injury would not state an Eighth Amendment violation." *Whittington v. Ortiz*, 472 F.3d 804, 808 (10th Cir. 2007).

(Dkt. #87 at 15-16.)

The Court finds that, viewing the record as a whole and drawing all inferences in the light most favorable to Mrs. Freeman, there are disputed material facts as to whether Defendants' failure to provide her with a medical mattress, and their denial of access to a wheelchair or an OCA III, constitutes a cognizable conditions of confinement claim under the Eighth Amendment. On occasions when Defendants failed to provide Mrs. Freeman with a wheelchair or an appropriate OCA, they essentially presented her with the dilemma of choosing between standing and walking unassisted, which she says involves significant pain and the risk of falling, and missing meals and medication, which is untenable given her age and condition.[5] *See, e.g., Estelle v. Gamble*, 429 U.S. 97, 103 (1976) ("An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met."). Thus, Mrs. Freeman has satisfied the second factor.

### c. Step Three: Sovereign Immunity Analysis

Because the Court has determined that Mrs. Freeman has presented sufficient evidence that Defendants' conduct violated the ADA and the Fourteenth Amendment, the Court does not have to address the final factor. *See Georgia*, 546 U.S. at 159.

---

[5] There appears to be a factual dispute as to how many meals and med-line visits Mrs. Freeman missed in the 30-day period. The Court does not find this to be dispositive. The fact that there exists disputed issues of material facts whether Mrs. Freeman was faced with the choice of forgoing meals and medicine or enduring pain and risking injury due to the lack of reasonable accommodations is sufficient to proceed.

After considering the factors set forth in *United States v. Georgia*, the Court concludes that the Eleventh Amendment does not bar Mrs. Freeman's ADA claim.

## IV. ORDER

It is hereby **ORDERED** that Defendants' Motion for Summary Judgment (Dkt. #94) is **DENIED**.

Dated: March 21, 2019
Denver, Colorado

N. Reid Neureiter
United States Magistrate Judge